[Crim. No. 7047.    Second Dist., Div. One.    Feb. 20, 1961.]

THE PEOPLE, Respondent, v. CHARLENE E. ERVING, Appellant.

I. A. Kanarek for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

WOOD, P. J.—An indictment presented in May 1957, by the grand jury of Los Angeles County accused "Jane Doe (Charlene) female Negro, 39 years, 5'7", weight 165 pounds, olive complexion" with three counts of unlawfully selling heroin on March 14, 18, and 19, 1957. By virtue of the indict-

ment Charlene E. Erving was arrested in April 1959. On April 27, 1959, when defendant was present in court, the indictment was amended to state that the true name of the defendant is Charlene E. Erving. She was arraigned on May 11, 1959. On November 17, 1959, the indictment was amended by adding thereto an allegation that defendant had been convicted previously of violating section 11500 of the Health and Safety Code, a misdemeanor. Defendant admitted the allegation of prior conviction. In a jury trial defendant was found guilty as charged in the three counts. Probation was denied and she was sentenced to imprisonment in the state prison. She appeals from the judgment and the order denying her motion for a new trial.

Richard Renty testified as follows: He became a police officer in Los Angeles in October 1956, and was assigned to duties in the East Fifth Street area as an undercover officer in the narcotics division. On March 14, 1957, about 4:30 p. m., a man introduced him to defendant when they were at the corner of Seventh and Stanford Streets. About 7:30 p. m. of that same day he (witness) went to the Belvedere Hotel on East Sixth Street where he saw Charlene, the defendant, in the kitchen. He asked her if he could get a $10 paper. After replying in the affirmative, she took him to another room where he gave her a $10 bill. She left the room and returned about five minutes later and handed a bindle to him. The expression "$10 paper," as used by addicts, means heroin. He took the bindle to the narcotics division, put his initials on the bindle, sealed the bindle in an envelope, and delivered the envelope to his superior officer who "booked" it at the police station. The bindle which is in the envelope, referred to as Exhibit 1, is the bindle which the defendant handed to him on March 14, 1957.

He testified further that on March 18, 1957, he went into room 4 of the same hotel and there told defendant that he wanted a $10 paper. She said she might get it from another girl. He handed $10 to defendant and she took him to a room marked "Manager" and told him to wait there. She left the room and returned about five minutes later and handed a bindle to him. He took the bindle to the narcotics division, put his initials on the bindle, sealed the bindle in an envelope and delivered the envelope to his superior officer who "booked" it at the police station. The bindle which is in the envelope, referred to as Exhibit 2, is the bindle which the defendant handed to him on March 18, 1957.

He testified further that on March 19, 1957, he saw defendant in the hallway of the same hotel and she took him into a room marked "Manager." He asked her if he could get a $10 paper. After she said she could get it, he handed $10 to her. She left the room and returned about five minutes later and handed a bindle to him. He marked the bindle and delivered it to his superior officer in the same manner he had marked and delivered the two other bindles. The bindle in the envelope, referred to as Exhibit 3, is the bindle which the defendant handed to him on March 19, 1957.

The white substance which was in each of the three bindles was heroin.

Defendant testified in substance as follows: She is 43 years of age and has lived in Seaside, California (near Monterey) since 1950. She was arrested in her home in Seaside in April 1959, about 3 o'clock in the morning. She did not sell heroin to Renty on March 14 or 18 or 19, 1957. In March 1957, she lived in her home in Seaside and she performed day work in different homes in the area of Monterey and Carmel. She worked for Mrs. Hancock, Mrs. Mac, and Mrs. Gann. In the summer of 1956 she worked at the Casa Munros Hotel in Monterey. In March 1957, her husband was employed at the Monterey Airport as building superintendent, and he owned a business known as Irving Ramp Service at Fort Ord. In the first part of March 1957, while she was at her home she paid an insurance premium to an insurance agent who came to her home. She and her husband had lived at the Belvedere Hotel in 1949 before they moved to Seaside. The last time she was at that hotel was just before Thanksgiving Day in 1956 when she and her husband went there during his vacation. After his vacation was over he returned to their home, and she visited at the hotel. Her weight is 110 pounds. In 1957 her weight was between 110 and 115 pounds.

On cross-examination, she testified that she did not register at the Belvedere Hotel in 1956; and she has never seen the register for that hotel.

At the request of the deputy district attorney, during cross-examination of defendant, a book which he referred to as a hotel register was marked Exhibit 6 for identification. The deputy opened the book at a certain page (which page was not numbered) and said that on the second line from the bottom of the page there appears the date March 4, 1957, and "a signature of a name," and opposite the name there is the

writing "Check Out." The deputy asked defendant if she wrote the words "Check Out." She replied, "No."

Defendant's husband testified in substance as follows: On March 14, 18, and 19, 1957, the defendant was at their home in Seaside. He is a building superintendent for the Monterey Airport and is the owner of the Irving Ramp and Baggage Service. In March 1957, the defendant's weight was about 110 pounds. About September 1956, he and defendant were at the Belvedere Hotel.

Mrs. Nicolas, called as a witness by defendant, testified that she (witness) resided in Carmel; her husband is an Episcopalian clergyman; defendant has been employed by her since January, 1958.

Mrs. Hancock, called by defendant, testified that she resides in Carmel; she is an interior decorator; in March 1957, defendant did housework in the home of the witness, but she (witness) cannot say that she saw the defendant on March 14 or 18 or 19, 1957.

Mr. Page, called by defendant, testified that he resides in Seaside; he is a Baptist minister; he has known defendant since 1954; she is assistant pianist in his church and is president of the choir; in the middle of March he saw defendant in Seaside; she participated in the Easter program and the preparation of that program in 1957 (Easter in that year was April 21); he saw her the first and second Sundays in March 1957, but after that he does not remember when he saw her in that month; she had been absent from the church and she returned around the first of March, 1957.

Mr. Turner, called by defendant, testified that he resides in Seaside and is a teletype operator; early in March 1957, when he became the pianist for a Baptist church in Seaside he saw the defendant at the church; he saw her in Seaside many times during March 1957.

Mr. Nottenkamper, called by defendant, testified that he resides in Pacific Grove and is an agent of an insurance company; he has known defendant and Mr. Irving since 1950, when he sold them an insurance policy; since that date he has called at their home many times to collect the monthly insurance premium; on March 4, 1957, he collected an insurance premium from her; after that date he saw her in the Monterey area several times but he cannot recall the exact times when he saw her.

In rebuttal, the prosecution called Officer Barry who is a narcotics agent for the state. The deputy district attorney

directed the witness' attention to Exhibit 6 for identification (the book which the deputy had referred to as a hotel register) and asked him if he had seen the book previously. He replied that he first saw the book on May 27, 1959, at the Belvedere Hotel on East Sixth Street in Los Angeles. The deputy asked him if he was at the hotel on that date in his capacity as a state narcotics officer. Counsel for defendant said: ''I will object to the question and I would like to now ask the witness——.'' The judge said: ''The motion will be denied. Proceed.'' The deputy told the witness to answer the question. The witness answered, ''Yes, I was.'' Then the following questions were asked and the following answers and statements were made: ''Q. [by deputy] : Did you have occasion to take any records or books from that hotel? Mr. Kanarek: Your Honor, I object to the question and ask that I be allowed to interrogate him on *voir dire*. The Court: The objection will be overruled and the motion denied. The witness: Yes, I did. Q. [by deputy] : Directing your attention to People's Exhibit 6, did you remove that from the premises of the Belvedere Hotel? A. Yes, sir. Q. How are you able to identify that book? A. I placed the initials of myself and my fellow officer together with the date on the front page of this book. Q. Did you ascertain who the owner of the Belvedere Hotel was at that time? Counsel for defendant: Your Honor, I object to the question. So that I don't impede counsel, may I make a continuing objection to this entire examination. The Court: Very well. The motion will be denied. The objection will be overruled. Counsel for defendant: The objection is based on a request that I interrogate Mr. Barry on *voir dire* with respect to this book. The Court: Motion denied. Proceed with your questioning. Q. [by deputy] : Where on the premises of the Belvedere Hotel did you recover the book? A. I believe the book was taken from the manager's office.''

Mr. Mire, called by the prosecution as a witness on rebuttal, gave testimony which was legally sufficient to support a conclusion by the trial judge that the witness was qualified as a handwriting identification expert. The judge denied the request of counsel for defendant for permission to examine the witness on *voir dire* regarding his qualifications. The deputy district attorney said to the witness: ''Directing your attention to People's Exhibit 6 for identification which is a book, a hotel register, and in particular to a page where there are paper clips, have you ever seen this book and this page before?'' The witness replied, ''Yes, in August of 1959.'' The

deputy asked: "Did you have occasion to compare any portion of the writing appearing in the book of People's Exhibit 6 with the writing that appears on People's 5 for identification [exemplar of defendant's handwriting]?" Counsel for defendant objected to the question on the ground that "no proper foundation has been laid for this book to be considered by this court in any manner whatsoever. CCP 1953f [Code Civ. Proc., § 1953f] gives requirements under which this book can be considered." The objection was overruled. The witness answered: "Yes, I did make an examination of the words 'check out' written in pencil on People's Exhibit 6 after the date 3-4-57, and the name Edward Houston, with the penciled writing on People's Exhibit 5." The deputy asked: "Now, as a result of that comparison did you form any opinion or conclusion?" Counsel for defendant said: "I object to any conclusion and opinion or any testimony with regard to this book. This book is purportedly a hotel register and in the ordinary course of business only the custodian or someone who is a hotel clerk who is at the business can lay any foundation for any testimony concerning this book." The objection was overruled. The deputy asked: "What was your opinion or conclusion?" Counsel for defendant objected "to the conclusion or opinion being given on the basis that that book is incompetent evidence." The objection was overruled. The witness answered. "It is my definite conclusion that the penciled writing written on People's Exhibit 5 [and] in the words 'check out' written on People's Exhibit 6 after the date 3-4-57 was made by one and the same person." The deputy offered Exhibit 6 for identification (the book) in evidence. Counsel for defendant said: "I object to it. Absolutely no foundation has been laid for that book that it was prepared in the ordinary course of business. CCP 1953f is part of the law of the state. That book cannot go into evidence." The deputy said that, as counsel for defendant pointed out, section 1953f of the Code of Civil Procedure "provides that if a book is properly authenticated by the person responsible for keeping of the book then the truth of the activity then or occurrence recorded in the book is provable by use of the book. But in the case now before the Court this Section 1953f doesn't even apply because we are not trying to prove the truth of any act or occurrence or event, because we are not trying to show that a certain person did or did not register at this hotel on March 4th. All the People are trying to show in this case is that the handwriting opposite the date of March 4, 1957,

is the handwriting of the defendant.'' Counsel for defendant said that the section did apply because the prosecution was attempting to prove that appellant wrote said words on March 4, 1957; and also there was no authentication with respect to that date. The objection was overruled and the book was received in evidence.

Appellant contends that she ''has not been brought within the jurisdiction of the court'' and that all the proceedings in the superior court were without probable cause, without jurisdiction, and without due process of law. Her argument seems to be that the indictment was defective in that the person allegedly indicted was not adequately named or described in the indictment so that she could be identified. It is apparent that the person indicted was charged in the indictment by a fictitious name, namely, Jane Doe (Charlene). In addition to such designation, the person was described as ''female Negro, 39 years, 5'7'', weight 165 lbs, olive complexion.'' It is conceded by the prosecution that the part of the description as to weight was erroneous in that the weight stated should have been 110 pounds instead of 165 pounds. Also there was some discussion at the trial as to whether the description referring to her as a person of ''olive complexion'' was correct, but otherwise there was no controversy as to the description. After appellant was arrested and while she was in court on April 27, 1959 (prior to plea), the indictment was amended to state that the true name of the defendant is Charlene E. Erving. ''When a defendant is charged by a fictitious or erroneous name, and in any stage of the proceedings his true name is discovered, it must be inserted in the subsequent proceedings, referring to the fact of his being charged by the name mentioned in the accusatory pleading.'' (Pen. Code, § 953.) This contention regarding the designation of the accused in the indictment is not sustainable.

Appellant contends that the court erred in receiving the alleged hotel register in evidence. She argues to the effect that the book was hearsay and that a proper foundation was not laid for receiving the book in evidence, as an exception to the hearsay evidence rule, under the provisions of section 1953f of the Code of Civil Procedure (which section is a part of the Uniform Business Records as Evidence Act).[1] Ap-

[1]Section 1953f of the Code of Civil Procedure provides: ''A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity

pellant also argues to the effect that the prosecution, by introducing the book in evidence, sought to prove "an act, condition or event." The respondent (prosecution) asserts in effect that said section 1953f has no application here for the reason "the register was not offered to prove the truth of any of the matters stated therein," and that "it had no significance at all apart from the testimony of the handwriting expert," and that "the hotel register together with the testimony of the handwriting expert was thus relevant as circumstantial evidence of appellant's presence at the Belvedere Hotel during the month of March, 1957." Appellant had testified that she had not been at that hotel since Thanksgiving Day in 1956. Officer Barry testified that he took Exhibit 6 (alleged hotel register) from the hotel in 1959, and he believed that it was taken from the manager's office. Officer Renty testified that the bindles involved in two of the sales (March 18 and 19) were handed to him by defendant when he and defendant were in a room which was marked "Manager." A general description of the Exhibit 6 (register) is: It is 14 inches long, 8½ inches wide, and about ¾ of an inch thick; the cover is made of cloth and cardboard; the printed words "Hotel Register" are on the outside of the book and at the top of each page; the book contains about 150 pages—the pages are not numbered; the name "Belvedere Hotel" is in pencil writing at the upper right corner of the first page; each page has about 23 printed lines, extending crosswise of the page, and printed lines extending lengthwise of the page which form columns that bear printed headings such as "Date," "Name," "Address," "Time of Arrival," and "Time of Departure"; about 120 pages are filled with names, dates, etc.; the first date in the book is September 10, 1943, and the last date is May 27, 1959. The jury could have inferred that the book was the register of the hotel. The words "Check Out," referred to herein, are on the 72d page of the book (not numbered). A prosecution witness, who testified as a handwriting identification expert, testified to the effect that the words "Check Out" were written by appellant. If the jury believed that appellant wrote those words, the jury might reasonably have inferred that the words were written subsequent to the time the date "3-4-57" and the name "Edward Houston"

and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

were written therein. Also, if the jury believed that appellant wrote those words, the jury might reasonably have inferred that appellant, by writing those words at a place in the book opposite the date "3-4-57," and in the same lined space in which the date appears, intended to and did adopt the date already appearing therein as the date to be applied to her writing of the words "Check Out." A disputable presumption is that a writing is truly dated. (Code Civ. Proc., § 1963, subd. 23.) The jury was instructed that there was such a presumption. If appellant wrote the words "Check Out" in the book, she thereby became a maker of a part of the record or book which was offered in evidence against her. In such a situation her own act of writing, as shown by the record or book, would be admissible in evidence. Usually under the provisions of said section 1953f no part of the record involved has been made by the person against whom the record is offered, but it is a record that has been made by another person in the usual course of business and ·it relates to acts of the person against whom it is offered. Since there was substantial evidence in support of the prosecution's theory of the case that the book or record contained writing of the appellant, the court did not err in receiving the book in evidence.

■■ Appellant contends that the deputy district attorney's argument to the jury with respect to the exemplar of appellant's handwriting, Exhibit 5 for identification, was improper because the exemplar was not received in evidence. He also asserts in effect that the court erred in allowing the exemplar, which was an exhibit for identification, to be taken by the jury into the jury room. Appellant testified that the writing on Exhibit 5 for identification is her handwriting, except that the date "August 20th" thereon does not look like her writing and she would not say that the date is or is not her writing. The prosecution witness who testified as a handwriting identification expert testified concerning the exemplar. Since there was testimony before the court regarding the exemplar, the deputy district attorney was entitled to discuss that testimony in his argument to the jury. (See *People* v. *Costa*, 145 Cal.App. 2d 445, 447 [302 P.2d 634].) Appellant did not object to the deputy's reference to the exemplar, or object to the exemplar being taken into the jury room. Appellant did not call the judge's attention to the fact that the exemplar had not been received in evidence. It is apparent that by reason of inadvertence the Exhibit 5 for identification (the exemplar) was not offered or received in evidence. It was admissible in evidence.

There was no improper conduct or prejudicial error with regard to the exemplar.

Another contention of appellant is that certain statements which the deputy district attorney made in the presence of the jury before and during the deputy's argument constituted misconduct. Some of the statements so referred to were to the effect that the deputy said that the defense was trying to confuse the record, that appellant was trying to cloak herself with respectability, that the reason Mrs. Gann was not present to testify was that her memory could not be refreshed, and that the appellant had a heavy conversation with her counsel. Appellant also asserts that the deputy accused her counsel of misrepresentation. It would unduly extend this opinion if detailed references were made to those statements. With one exception, appellant did not assign any of the statements as misconduct or request the court to instruct the jury to disregard any statement. The exception referred to related to argument of the deputy to the effect that there was misrepresentation by counsel for appellant in that he did not read any of the leading questions that were asked Officer Renty at the hearing before the grand jury. Thereupon counsel for appellant asked the judge to admonish the deputy not to make such prejudicial statements. The judge replied, "Well, the jury understands that this is just argument." The statements referred to did not constitute prejudicial misconduct.

Appellant also contends that the court erred in not receiving certain checks in evidence. One of the checks so referred to was for $32.02, dated March 4, 1957, drawn by Mrs. Hancock, and payable to Ethel Johnson for house work done at Mrs. Hancock's home in Carmel. Ethel Johnson is the mother-in-law of appellant. There was testimony that on occasions appellant substituted as employee at Mrs. Hancock's home in place of Ethel Johnson. Apparently the appellant offered the check in evidence on the theory that it would tend to prove that appellant was in Carmel on March 4, 1957. The court did not err in sustaining the objection to the offer of that check in evidence. The other checks so referred to were drawn by appellant's husband and were payable to persons other than appellant. Appellant states that those checks were offered to prove that appellant's husband signed all checks pertaining to their household expenses. The court did not err in sustaining the objection to the offer.

Appellant contends further that the "testimony of defense counsel, called by the prosecution, and given over

defense counsel's objections, constitutes error." During the rebuttal part of the trial, the deputy district attorney called Mr. Kanarek, attorney for appellant, as a witness and asked him if he represented the defendant at a former trial. The attorney said he refused to answer on the ground of the "attorney-client privilege." The judge told him to answer the question. He answered, "Yes." The deputy asked: "And on the former occasion did you have occasion to subpoena Mr. Gann?" The attorney said he refused to answer on the ground of the attorney-client privilege. The judge told him to answer the question. He answered that he "never subpoenaed a Mr. Gann." The deputy asked if he used Mr. Gann as a witness. The attorney replied: "I believe counsel [deputy] is completely confused. You perhaps have some other man in mind and not Mr. Gann." Thereafter the following occurred: "Q. [by deputy] Did you have a reverend down here? A. [by attorney for defendant] I had Reverend H. M. Nicolas, who is the husband of Mrs. Nicolas who testified earlier today. Q. That is the man you had last time? A. Yes. Q. You didn't have Mr. Gann at the former trial? A. No. Q. Do you know where Mr. Gann is? A. No. As I recall I have never seen Mr. Gann, but I understand he is a novelist of some success who has written a book. Q. I didn't ask you that. I said, 'Did you make any attempt to subpoena Mr. Gann?' A. No." Appellant argues that the proceeding involving the testimony of her attorney served no purpose except to prejudice the jury. Appellant's attorney does not contend on appeal that he was required as such witness to disclose information that was confidential between him and his client. The first question which was asked the attorney for appellant, and to which he objected, referred to representation of defendant "at *a* former trial." That question would indicate that the deputy was making a general inquiry that carried with it an implication that appellant had been on trial previously upon a different charge. Other questions, however, establish that the reference was to representation in the former trial of the present case. Also, in other parts of the present trial there were references to a former trial of the present case. (It seems that a mistrial had been declared because there was an improper reference in the former trial to the prior misdemeanor conviction of appellant.) In the present trial the name of Mr. Gann had been mentioned but he had not been called as a witness. Apparently the deputy district attorney, by calling the attorney as a witness, was attempting to account for the absence of Mr. Gann. It does

not appear that prejudice resulted from the acts of the deputy district attorney in calling and questioning the attorney as a witness.

Other contentions of appellant are to the effect (1) that the court unduly limited the cross-examination of prosecution witnesses, and (2) that the prosecution's attempt to "rehabilitate" Officer Renty with respect to his testimony as to the weight of appellant and as to other matters was improper. These contentions relate to matters which were within the discretion of the trial judge. The points involved are not sufficiently meritorious to justify a detailed statement of the evidence upon which the points are allegedly based. The court did not abuse its discretion in the matters involved in these contentions.

In view of the above conclusions it is not necessary to discuss other contentions.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied March 15, 1961, and appellant's petition for a hearing by the Supreme Court was denied April 19, 1961.